**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CASE NO.: 5:25-CV-00007**

YUKON PACKAGING, LLC,

  Plaintiff,

vs.

JONES SUSTAINABLE PACKAGING, LLC,

  Defendant.

**PLAINTIFF YUKON PACKAGING, LLC'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………………………..iii

TABLE OF EXHIBITS………………………………………………………………………..vi

I.      INTRODUCTION ......…………………………………………………………………...1

II.     BACKGROUND …………………………………………………………………………….2

      A.     Yukon and its 3-Piece Design…………………………………………………..2

      B.     The Patents-in-Suit…………………………………………………...............3

      C.     Defendant Recently Entered the Market and is Posed to Expand Rapidly………...3

      D.     The Parties Compete in a Two-Player Market—Defendant is the Only Actor Brazen Enough to Disregard the Patents-in-Suit…………………………….5

      E.     The Accused Product…………………………………………………………….6

      F.     Defendant's Arguments and Admissions in Two Related Cases are Relevant to Considering its Infringement of the Patents-in-Suit……………………….7

III.    LEGAL STANDARDS………………………………………………………………….9

IV.    ARGUMENT…………………………………………………………………………...9

      A.     Yukon is Likely to Succeed on the Merits………………………………………9

           1.     The Accused Product Infringes the '264 Patent………………………….10

           2.     The Accused Product Infringes the '265 Patent………………………….11

           3.     The Accused Product Infringes the '562 Design Patent…………………..13

      B.     Absent an Injunction, Yukon will Suffer Irreparable Harm………………………14

           1.     Loss of Market Share……………………………………………………14

           2.     Drastic and Irreversible Price Erosion……………………………………17

           3.     Yukon Will Lose Business Opportunities, Goodwill, and its Reputation as Innovator and Market Leader Will be Permanently Harmed…………….20

      C.     The Balance of Hardships Strongly Favors Yukon……………………………….21

      D.     The Public Interest Weighs in Favor of a Preliminary Injunction……………….24

i

V.    CONCLUSION………………………………………………………………………..25

ARTIFICAL INTELLIGENCE (AI) CERTIFICATION ………………………………….....26

# **TABLE OF AUTHORITIES**

**Cases:**                                                     **Page**

*ActiveVideo Networks, Inc. v. Verizon Commc'n, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012)……………………………………………………..24

*Aevoe Corp. v. Shenzhen Membrane Precise Electron Ltd.*,
No. 2:12-cv-000054-GMN, 2012 WL 1532308 (D. Nev. May 1, 2012)……………………22

*Apple Inc. v. Samsung Elecs. Co.*,
735 F.3d 1352 (Fed. Cir. 2013)……………………………………………………14

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
809 F.3d 633 (Fed. Cir. 2015)………………………………………………………21, 24

*AstraZeneca LP v. Apotex Corp.*,
623 F. Supp. 2d 579 (D.N.J. 2009)
*aff'd* 633 F.3d 1042 (Fed. Cir. 2010)………………………………………………9, 19

*Bio-Tech Gen. Corp. v. Genentech, Inc.*,
80 F.3d 1553 (Fed. Cir. 1996)………………………………………………………19

*Dobson v. Dornan*,
118 U.S. 10 (1886)……………………………………………………………………13

*Douglas Dynamics, LLC v. Buyers Prod. Co.*,
717 F.3d 1336 (Fed. Cir. 2013)……………………………………………………15, 21

*Gorham v. White*,
81 U.S. 511 (1871)……………………………………………………………………14

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
174 F.3d 411 (4th Cir. 1999)…………………………………………………………8

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010)………………………………………………………21

*Int'l Rectifier Corp. v. IXYS Corp.*,
No. 00-cv-6756, 2006 WL 8433999 (C.D. Cal. Nov. 13, 2006)………………………16

*LEGO A/S v. ZURU Inc.*,
799 F. App'x 823 (Fed. Cir. 2020)…………………………………………………23

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
No. 2011-1054, WL 5601460 (Fed. Cir. Nov. 18, 2011)…………………………………14

iii

*PCT Int'l Inc. v. Holland Elecs. LLC*,
    No. 12-cv-01797, 2015 WL 5210628 (D. Ariz. Sept. 8, 2015,
    *aff'd*, 668 F. App'x 367 (Fed. Cir. 2016)……………………………………………20, 22

*Port-a-Pour, Inc. v. Peak Innovations, Inc.*,
    49 F. supp. 3d 841 (D. Colo. 2014)………………………………………………………23

*PPG Indus., Inc. v. Guardian Indus. Corp.*,
    75 F.3d 1558 (Fed. Cir. 1996)……………………………………………………………22

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011)……………………………………………………*passim*

*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc.*,
    821 F. Supp. 2d 681 (D.N.J. 2011),
    *aff'd and remanded sub nom*, 748 F.3d 1354 (Fed. Cir. 2014)………………………………19

*Sanofi-Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006)……………………………………………………20, 24

*Sport Dimension, Inc. v. Coleman Co.*,
    820 F.3d 1316 (Fed. Cir. 2016)……………………………………………………………13

*Sun Hill Indus., Inc. v. Easter Unlimited, Inc.*,
    48 F.3d 1193 (Fed. Cir. 1995)……………………………………………………………14

*3M Unitek Corp. v. Ormco Co.*,
    96 F. Supp. 2d 1042 (C.D. Cal. 2000)………………………………………………16, 21

*Tinnus Enters., LLC v. Telebrands Corp.*,
    846 F.3d 1190 (Fed. Cir. 2017)……………………………………………………………21

*TM Comput. Consulting, Inc. v. Apothacare, LLC*,
    2008 WL 4238913 (D. Or. 2008)…………………………………………………………23

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
    748 F.3d 1159 (Fed. Cir. 2014)……………………………………………………………22

*TruePosition Inc. v. Andrew Corp.*,
    568 F. Supp. 2d 500 (D. Del. 2008)……………………………………………………...15

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)………………………………………………………………………8, 9

iv

**Rules and Statutes:**

35 U.S.C. § 271(a)…………………………………………………………………………………9

Fed. R. Civ. P. 65(b)…………………………………………………………………………......1, 9

# TABLE OF EXHIBITS

| Exhibit: | Description: |
|---|---|
| | **Declaration of Tom BenGera, Esq.** |
| A-1[1] | Related State Action, DE 3, Complaint |
| A-2 | Related State Action, DE 24, Eco Fiber's Motion in Support of its Amended Motion for Preliminary Injunction, and DE 26, Amended Affidavit of Brian Kent Shneider, Sr. in Support thereof. |
| A-3 | Related State Action, DE 30, Defendant's Opposition to Eco Fiber's Motion for Preliminary Injunction |
| A-4 | Related State Action, DE 34, Declaration of Christopher Poore in Support of Defendants' Opposition to Eco Fiber's Motion for Preliminary Injunction |
| A-5 | Related State Action, DE 39, Declaration of Rabindranauth Heeralall in Support of Defendants' Opposition to Eco Fiber's Motion for Preliminary Injunction |
| A-6 | Related State Action, DE 59, Order Denying Eco Fiber's Amended Motion for Preliminary Injunction |
| A-7 | Related State Action, DE 66.1, Draft Vendor Pricing Commitment Agreement (redacted), attached as Exhibit I to Declaration of Christopher Poore |
| A-8 | Related State Action, Hearing Transcript from July 11, 2024 Preliminary Injunction Hearing |
| A-9 | Related Federal Action, DE 18, Defendant's Opposition to Eco Fiber's Motion for Preliminary Injunction and Bond |
| A-10 | Related Federal Action, DE 19, Declaration of David Vance in Support of Defendant's Opposition to Eco Fiber's Motion for Preliminary Injunction and Bond |
| A-11 | Related Federal Action, DE 26, Hearing Transcript from June 18, 2024 Preliminary Injunction Hearing |
| A-12 | Related Federal Action, DE 28-01, Eco Fiber's Memorandum in Support of its Motion for Order to Show Cause |
| A-13 | Related Federal Action, DE 39, Eco Fiber's Amended Complaint |
| A-14 | Related Federal Action, DE 60, Eco Fiber's Response in Opposition to Defendant's Motion to Dismiss Amended Complaint |
| A-15 | Related Federal Action, DE 68, Defendants' Memorandum in Support of Motion for Leave to File Supplemental Documents in Support of Defendants' Motion to Dismiss the Amended Complaint |
| A-16 | Related Federal Action, DE 69-1, Proposed Exhibit 1 to Consent Motion to File under Seal |
| A-17 | Related Federal Action, DE 69-3, Proposed Exhibit 3 to Consent Motion to File under Seal |
| A-18 | Related Federal Action, DE 72, Eco Fiber's Response in Opposition to Defendants' Motion for Leave to File Supplemental Documents in Support of Defendants' Motion to Dismiss the Amended Complaint |
| A-19 | Related Federal Action, DE 73, Defendants' Reply in Support of their Motion for Leave to File Supplemental Documents in Support of Defendants' Motion to Dismiss the Amended Complaint |
| A-20 | November 8, 2024 Contribution Agreement between Eco Fiber, Inc. and Jones Sustainable Packaging, LLC. [**FILED UNDER SEAL**] |
| A-21 | November 12, 2024 "Notice of Special Shareholder Meeting of Eco Fiber, Inc" related to "Proposed Transaction" [**FILED UNDER SEAL**] |

---

[1] Numbered exhibits are attached as exhibits to the respective declarations submitted contemporaneously in support of this Motion.

| A-22 | August 6, 2024 Letter from Eco Fiber, Inc. to Yukon Packaging, LLC regarding "Derivative Demand" |
|------|---|
| A-23 | Demonstrative Table Comparing U.S. Patent No. 11,772,872, Claim 1 with U.S. Patent No. 12,195,265, Claim 12. |
| A-24 | Delaware Department of State: Division of Corporations, "Entity Details" for Defendant, Jones Sustainable Packaging, LLC |
| A-25 | Excel Workbook titled "Small_3-Piece.xlsx" for Eco Fiber product, "3PC SMALL KIT" Worksheet (Produced in the Related State Action as part of YUKONETAL-002641) [**FILED UNDER SEAL**] |
| A-26 | Excel Workbook titled "Small_3-Piece.xlsx" for Eco Fiber product, "PROCESS FLOW" Worksheet (Produced in the Related State Action as part of YUKONETAL-002641) [**FILED UNDER SEAL**] |
| A-27 | April 12, 2024 "Noninfringement Review of U.S. Patent No. 11,772,872, signed by Chad. D Tillman (attorney of record for Eco Fiber, Inc.) |
| A-28 | Eco Fiber Website, "Products" page, available at www.ecofiberinc.com/our-product |
| A-29 | Eco Fiber Website, "Services" page, available at www.ecofiberinc.com/our-services |
| A-30 | November 18, 2024 Press Release: "Jones Family of Companies and Eco Fiber Inc. Enter Joint Venture to Launch Eco Fiber Packaging" |
| A-31 | Announcement on Jones Family of Companies website regarding "formation of a joint venture" between Jones Family of Companies and Eco Fiber Inc., available at https://jonesfamilyco.com/family-of-companies/ecofiber-packaging |
| A-32 | Jones Sustainable Packaging Brochure |
| A-33 | Jones Family of Companies Website, "History" page, available at |
| A-34 | Jones Family of Companies Website, "Home" page, available at https://jonesfamilyco.com/ |
| A-35 | Jones Family of Companies Website, "One Jones" page, available at https://jonesfamilyco.com/one-jones |
| A-36 | May 4, 2015 Article titled "At Jones Fiber Products, it's all about the people," by Dorothy Whitcomb, available at https://bedtimesmagazine.com/2015/05/at-jones-fiber-products-its-all-about-the-people/ |
| A-37 | Document produced as VERITIV-00004070    [**FILED UNDER SEAL**] |
| A-38 | Document produced as VERITIV-00004307-08 [**FILED UNDER SEAL**] |
| A-39 | Document produced as VERITIV-00004315-17 [**FILED UNDER SEAL**] |
| A-40 | Document produced as VERITIV-00006541-43 [**FILED UNDER SEAL**] |
| A-41 | Document produced as VERITIV-00012889-90 [**FILED UNDER SEAL**] |
|  |  |
|  | **Declaration of J.C. Poindexter** |
| B-1 | *Curriculum Vitae* |
| B-2 | Previous Court Testimony |
| B-3 | Previous Deposition Testimony |
| B-4 | Transmittal Letter |
| B-5 | LendingTree.com website with slogan |
|  |  |
| **C** | **Declaration of David K. Vance** |
| C-1 | February 16, 2024 Price Increase Email from Yukon to Veritiv |
| C-2 | February 15, 2024 Price Increase Letter from Yukon to Veritiv |
| C-3 | U.S. map showing Veritiv, Eco Fiber, and Yukon facilities |
| C-4 | December 2023 Email Chain between Yukon and East Coast Real Estate LLC |
| C-5 | "Lease Availability Report" for commercial real estate in the Charlotte, NC |

viii

Pursuant to Fed. R. Civ. P. 65(b), Plaintiff respectfully moves this Court for an Order temporarily restraining Defendant from continuing to infringe certain U.S. Patents.

## I.  INTRODUCTION

A temporary restraining order against Defendant—a recent market entrant and direct competitor with a massive financial backing and ambitious plans for immediate expansion—is essential to prevent catastrophic and irreparable harm to Yukon and its patented flagship product, particularly as Yukon is set to begin negotiating 2025 pricing with its largest customer next month.

Yukon is the industry leader in 'cold chain,' the industry term for insulated containers used to ship temperature-sensitive goods (*e.g.*, perishable food, medicine). Its patented technology represents a significant improvement over legacy insulated containers and has spurred a revolution in cold chain shipping. [DE 1-1 at 1:25-37.] Yukon's patented 3-Piece Design has been received in the industry as a game-changer. As more companies transition from "Legacy Products" (*i.e.*, Styafoam coolers and/or 1 or 2-piece insulated containers) to Yukon's patented 3-Piece Design, Yukon, patents in hand, deserves to enter these new markets without needing to compete against its own patented technology. Nor should Yukon be at risk of losing its existing business, including a major account with Veritiv Corp.—an entity which Defendant is actively courting. Yukon's reputation as innovator and market leader, and its ability to monetize its 3-Piece Design is predicated—in part—on the protections afforded by the Patents-in-Suit.

Defendant, by contrast, has systematically ripped off Yukon's innovative technology and recently launched a copycat product of its own. Defendant is unabashedly targeting Yukon's biggest customer, Veritiv Corp., which accounts for over 85% of Yukon's business. Overnight, Yukon has been forced into a two-player market with this fierce new competitor, and faces an existential threat to its market share, pricing, and reputation. Although, for this motion, Yukon need only demonstrate a likelihood of success, Yukon does far more. Using Defendant's *own documents and admissions*—Yukon establishes that the Accused Product infringes numerous claims of the Patents-in-Suit. Such a strong showing of infringement is not surprising where, as here, the Accused Product was developed for Defendant in 2021 by the patents' named inventor (David Vance), as part of a previous consulting relationship between Defendant's predecessor (Eco Fiber, Inc.) and Yukon's founding members. Given the strength of Yukon's infringement case and

the likelihood Defendant's market entrance will cause irreparable harm, immediate injunctive relief is clearly appropriate.

## II. BACKGROUND

### A. Yukon and its 3-Piece Design

Yukon was formed in September 2022 in order to fill a void in cold-chain and capitalize on Mr. Vance's patented technology. Exhibit A-10, ¶¶54-62. The Parties' submissions in the "Related Actions"[2] explain how, in 2021, David Vance and Christopher Poore brought their cold-chain expertise to Eco Fiber and taught Eco Fiber how to manufacture and sell the Accused Product. Exhibit A-3, pgs. 2-4; Exhibit A-4, ¶¶5-13; Exhibit A-10, ¶¶16-27. Eco Fiber was never able to capitalize on Mr. Vance's technology, and its plans to expand geographically never materialized. Exhibit A-3, pgs. 3-4. Sensing Eco Fiber's stagnation despite a burgeoning demand for the patented technology, Mr. Vance developed a plan to launch Yukon.[3] Id; Exhibit A-10, ¶¶33-44; Exhibit A-6, pgs. 7-8 (Defendants "plausibly argue that Eco Fiber's own actions imperiled its relationship with Veritiv…One reasonable inference is that Eco Fiber's excessive freight costs and unfulfilled promises are to blame for much of its lost business. Eco Fiber has not carried its burden to show otherwise").

Yukon currently operates facilities in 3 U.S. states where it manufactures and distributes its 3-Piece Design. Exhibit A-10, ¶¶56, 59; Exhibit A-5, ¶¶18-19. Yukon heavily markets the patented features of its 3-Piece Design. For example, the 3-Piece Design is an improvement over the legacy 1-Piece Design in that it enables customers (e.g., pharmacy) to fast-fill the insulated containers, greatly reducing costs. Vance Decl., ¶¶5-7. The 3-Piece Design also represents a significant improvement over the legacy use of Styrofoam, which was more expensive, inflexible, and terrible for the environment. Id., ¶8; Exhibit A-31 (Defendant referring to "traditional packaging materials like Styrofoam"); Exhibit A-1, ¶ 11.

---

[2] Refers collectively to the two other pending lawsuits involving related parties and patents: *Eco Fiber, Inc. v. Vance et al.*, No. 3:24-cv-465 in the Western District of North Carolina ("Related Federal Action") and *Eco Fiber, Inc. v. Yukon Packaging, LLC et al.*, 24CV020983-590 in the Superior Court of Mecklenburg County, North Carolina ("Related State Action").

[3] In the Related State Action, Eco Fiber accuses Mr. Vance and Mr. Poore of various torts relating to the parties' consulting relationship. However, the court in that case found that Eco Fiber was not likely to succeed on any of its causes of action. *See generally* Exhibit A-6.

Yukon's distributed architecture is intentional—the locations were chosen specifically to lower freight costs for its largest customer, Veritiv, a customer it now shares with Defendant. Exhibit A-10, ¶¶34, 58; Exhibit A-5, ¶¶19-20. Yukon's 3-Piece Design, the one that competes directly with the Accused Product, is Yukon's flagship product, accounting for over 95% of its revenue, almost all of which is sold to Veritiv for use in shipping pharmacy products to customers in need. Vance Decl., ¶¶5, 30, 42; Exhibit A-5, ¶20.

Yukon is poised and well-positioned to capitalize on the burgeoning demand for its 3-Piece Design. Yukon has plans to open several additional facilities over the coming months. Vance Decl., ¶¶46-52. The catalyst for Yukon's growth is two fold: (1) a desire to better-serve Veritiv by building facilities nearer to Veritv's distribution centers so as to lower freight impact; and (2) capturing new market share from other companies that have expressed interest in switching from Legacy Products to Yukon's patented 3-Piece Design. Id., ¶55.

### B. The Patents-in-Suit

The Patents-in-Suit are the three most recent additions to Yukon's patent portfolio, having just issued on January 14, 2025. [DE 1-1, 1-3, 1-5.] The patents are directed to Yukon's cold-chain products. In his previous declaration, Mr. Vance recounts the great effort over the years that went into developing the patented technology and filing for patent protection. Exhibit A-10, ¶¶10-15. The Patents-in-Suit are two utility patents, and one design patent.

### C. Defendant Recently Entered the Market and is Poised to Expand Rapidly

Defendant was formed on October 1, 2024 (Exhibit A-24) and took over operations from Eco Fiber, Inc. less than two months ago. Exhibit A-21; Exhibit A-18, pg. 2 ("Going forward, …, the manufacturing of such containers will be conducted by the new entity"). Defendant is a self-proclaimed "joint venture" between Eco Fiber, Inc. (the plaintiff in each of the Related Actions) and Jones Family of Companies ("JFC"), a company with "90 years [of] experience in textiles." Exhibit A-30. Like Eco Fiber, Defendant is a direct competitor to Yukon. Exhibit A-2, pg. 12 ("Yukon, a direct competitor of EFI").] However, as it relates to their *ability* to compete with Yukon, there are two notable differences between Eco Fiber and Defendant.

First, Defendant is much larger than Eco Fiber, since it is now funded and backed by JFC. Before being forced to take on outside investors, Eco Fiber was a modest first-generation company

3

operating predominantly out of a single location[4] occupying less than 50,000 square feet, cash-strapped[5], struggling to meet a modest demand, and deriving 85% of its revenues from a single customer. Exhibit A-2, DE 26 at, ¶¶7-8, 23-24, 30-32. In fact, prior to engaging Mr. Vance and Mr. Poore as consultants, Eco Fiber lacked the expertise to manufacture a single Accused Product, let alone compete for market share. Exhibit A-10, ¶¶5-9, 16-21.

Defendant is now part of the Jones "family," a 90-year old conglomerate with "three distinct divisions" and four "production facilities" spanning at least 14 different industries. Exhibits A-33, A-34, and A-35. In Tennessee alone, Defendant now has access to 250,000 square feet "devoted to nonwoven production." Exhibit A-36. Defendant boasts about its plan to leverage JFC's infrastructure to greatly expand its geographic footprint and grow its market share. Exhibit A-30, pg. 2 ("with Jones' manufacturing and warehousing facilities in Tennessee, New Hampshire, and Indiana joining EcoFiber [] locations in North Carolina and Texas, the new company now has expanded reach and capacity to serve customers nationwide with even greater reliability and efficiency."); Exhibit A-32, pg.4 ("Strategically Located to Service East Coast, Central Plains and West Coast").

The maps below demonstrate just how threateningly similar Defendant's new footprint is to Yukon's, and how much bigger it is than its predecessor's footprint. In the first map (bottom, left), each of the green pins represents a Veritiv distribution center in need of either Yukon's 3-Piece or the Accused Product. The three dark blue pins (AZ, TN, KY) represent Yukon's current facilities. The two turquoise pins (NC, TX) represent Eco Fiber's legacy locations. The second map (bottom, right), taken from JFC's website, is Defendant's new and expanded footprint:

 

---

[4] It is not clear how much of the Accused Product (if any) is being manufactured at Eco Fiber's second facility in Dallas, TX.
[5] Exhibit A-2, DE 26 at ¶¶ 29-37 ("the financial outlook for EFI is grave"); Exhibit A-41.

4

*See* Exhibit A-34, pg. 3; Exhibit C-3. These maps lay bare the imminent and increased threat that Defendant poses to Yukon's market share. Defendant's footprint will immediately allow Defendant to outgrow Eco Fiber's reach and compete for Veritiv accounts nationwide (the green pins).

Second, Defendant's ability to vertically integrate the manufacturing process for the Accused Product exacerbates the crisis facing Yukon. To make an Accused Product, the fibers must first be formed into a continuous roll, and then cut to form insulated pads of various dimensions. [DE 1-3, Cl. 1.] Previously, Eco Fiber was purchasing some of its fiber pre-rolled, and then cutting the pads and forming the remainder of the Accused Product in-house. *See, e.g.*, Exhibit A-39 ("they have to buy it…"); Exhibit A-20, pg. 12. Defendant's stated objective is to perform *all* of the manufacturing steps under one roof/company. Exhibit A-30, pg. 1 ("This new venture combines the strengths of ECO Fiber's expertise…with Jones Family of Companies' nearly 90 years of experience in textiles").

Accordingly, As Defendant enters the market more capable than the sum of its parts, it poses a much bigger threat to Yukon than did its predecessor.

### D. The Parties Compete in a Two-Player Market—Defendant is the Only Actor Brazen Enough to Disregard the Patents-in-Suit

During the preliminary injunction proceedings in the Related State Actions, Eco Fiber repeatedly claimed that it (now Defendant) was the only entity, other than Yukon, that could provide the 3-piece insulated container at issue. Exhibit A-8, pg. 14 ("there doesn't seem to be any dispute between the parties that these two companies are the only ones that can supply this product").[6] The Court took note of these repeated representations that the Parties compete in a two-player market. *Id.*, pg. 44 (THE COURT: "there is a flavor from all of the filings here that this is a two-business industry, that it's this side and that side and that's it"); *see also* Exhibit A-41. In what is a niche market with few players, Eco Fiber (now Defendant) has been the only party brazen enough to disregard the protections afforded by the Patents-in-Suit.

As explained below, the existence of a two-player market weighs heavily in favor of finding irreparable harm. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir.

---

[6] *See also* *id.*, pg. 26 ("nobody disputes that these two companies are the only ones that are in a position to supply this product in the short term, product that Veritiv needs"); *id.*, pg. 60 ("the record before the Court is that you've got two companies that can supply these materials.").

2011) ("the existence of a two-player market may well serve as a substantial ground for granting an injunction"). The two-player dynamic is intensified in this case because Defendant's sheer size as compared to its predecessor's. Previously, Eco Fiber was only able to compete with Yukon in certain markets, *i.e.*, those near Eco Fiber's Charlotte, NC facility where it could offer lower freight costs. By virtue of its recent affiliation with JFC, Defendant now has (1) a much larger distribution network, including locations closer to Veritiv facilities, from which it can offer Veritiv lower prices based on freight savings, and (2) access to cheaper fiber and other raw materials. Defendant is thus poised to do what Eco Fiber never could—compete against Yukon for the Veritiv business *outside of Charlotte*.

### E. The Accused Product

As of November 2024, Defendant has taken over operations from Eco Fiber, in that it (rather than Eco Fiber) now manufactures and sells the Accused Product, a 3-piece insulated container that infringes each of the Asserted Patents. Exhibit A-18, pg. 2. Each Accused Product comprises three insulated pads (top, bottom, and a third that wraps around the sides of the box), configured to fit inside a rigid container (*e.g.*, cardboard box) in a particular configuration.

To its credit, Defendant does not hide the fact that, as it relates to the Patents-in-Suit, the Accused Product is "the same" as Yukon's 3-Piece Product. Exhibit A-12, pgs. 2-3 ("insulated containers made and sold by Yukon to Veritiv…are the same as those made and sold by EFI").[7] That the two products are "the same" and that both practice the Patents-in-Suit is not surprising considering that the Accused Product was developed by Defendant Vance (the inventor) while him and Mr. Poore were consultants for Eco Fiber. Exhibit A-1, ¶34; Exhibit A-3, pgs. 2-3; *see also* Exhibit A-12, pg. 6 n.8. Defendant Vance used the Patents-in-Suit as a blueprint to develop the Accused Product. Defendant never alleges the Accused Product was modified after the consulting relationship ended.

---

[7] *See also id.*, pg. 5 (same); *id.*, pg. 6 ("There is no dispute between the parties that the insulated containers are the same."); *id.* ("Upon inspection by EFI's counsel, the insulated containers were found to be the same, but that the one from Yukon included the patent marking"); *id.*, pg. 7 ("Because the insulated containers are the same,

6

### F.   Defendant's Arguments and Admissions in Two Related Cases are Relevant to Considering its Infringement of the Patents-in-Suit

Key to the Instant Motion, including demonstrating 'likelihood of infringement,' are Defendant's **own previous arguments and admissions**—including statements about the Accused Product vis-à-vis the'872 Patent, which is at issue in the Related Federal Action, wherein the '872 Patent and '265 Patent are related and have overlapping claim elements. *E.g.*, Exhibit A-9, pg. 4; Exhibit A-27, pgs. 14-16. Although this is the only lawsuit in which Yukon is asserting the Patents-in-Suit, and the only lawsuit in which Jones Sustainable Packaging, LLC is a named defendant, there are significant overlaps between the instant lawsuit and two on-going lawsuits involving similar actors and related patents. Specifically, in May 2024, Defendant's predecessor-in-interest, Eco Fiber, filed two lawsuits.

1.   The Related Federal Action: The Related Federal Action, *Eco Fiber, Inc. v. Vance et al.*, No. 3:24-cv-465 is relevant for several reasons:

*First*, Eco Fiber previously argued that it does not infringe the '872 Patent on account that it does not practice the two "loading" steps of Claim 1. *E.g.*, Exhibit A-13, ¶¶148–49, 168–69; Exhibit A-11, pg. 8:7-12 ("[the '872 Patent] actually recites 12 steps that are part of the inventive process. A couple of the steps are loading the box with the thermally sensitive objects and loading the box with the cold pack. That is not performed by Eco Fiber."); *id.*, pgs. 10:22-24, 16:13-18, 35:13-16, 36:4-5; *id*., pg. 46:5-12 ("the **only issue** would be those downstream steps -- the steps performed by a downstream entity of **loading** the box with the cold pack and the thermally sensitive objects.").

However, the '265 Patent, which is a continuation of the '872 Patent, is broader than the '872 Patent in that it omits the two "loading" steps. Exhibit A-23.[8] As it relates to the '265 Patent, Defendant, who, in the Related Federal Action, leaned on an argument that it did not infringe the '872 Patent because it did not practice the two "loading" steps, is left without a leg to stand on.

---

[8] The other minor differences noted in this Exhibit are not material to the issue of 'likelihood of infringement.' For example, there is no dispute that Defendant's die-cutter comprises both a "knife device" ('872 Patent) and a "blade" ('265 Patent).

*Second*, the patents' inventor previously documented the efforts that went into designing Yukon's 3-Piece Design, including his (and others') research, testing and development, including efforts to obtain patent protection. *E.g.*, Exhibit A-10, ¶¶ 10-15.

2. The Related State Action: The Related State Action, *Eco Fiber, Inc. v. Yukon Packaging, et al.*, 2024CVS20983-590 is relevant for several reasons:

*First*, the fact that the Accused Product was admittedly developed by Mr. Vance and Mr. Poore, and that Eco Fiber previously paid a patent royalty for the privilege of practicing related patents, goes to likelihood of infringement. *See, e.g.*, Exhibit A-1, ¶¶ 22-23 45.

*Second*, it establishes that Yukon's 3-Piece Design and the Accused Product are direct competitors, and more importantly, that the Accused Product is Yukon's ***only*** competitor. *See, e.g.*, Exhibit A-1, pg. 30; Exhibit A-8, pgs. 14, 26, 45, 60. The fact that the Parties compete in a two-player market weighs heavily in the context of irreparable harm.

*Third*, it demonstrates several instances of bad faith conduct by Defendant's beneficial owners, including Mr. Kent Schneider, Jr. against Yukon and its members. For example, Schneider Jr. caused a Yukon founding member to be fired from Eco Fiber after he discovered that Schneider Jr. was unlawfully syphoning money out of Eco Fiber and into a separate entity which he owned with his father. *E.g.*, Exhibit A-5, ¶ 6; Exhibit A-22 (derivative demand and evidence of self-dealing). The litany of bad faith by Defendant's beneficial owners goes to balancing of the equities.

*Fourth*, in the Related State Action, Eco Fiber tried (but failed) to obtain injunctive relief against Yukon. In its 'public policy' argument, Eco Fiber claimed that *it* could easily meet market demand if *Yukon* were enjoined. *E.g.*, Exhibit A-8, pg. 60 ("The record before the Court, based on EFI's declarations, is that EFI has the ability to ramp up quickly and meet Veritiv's demand, period."). Yet the evidence, both then and now, demonstrates that Yukon has a more advantageous geographic footprint than Eco Fiber, significantly more capacity, and that it manufactures and sells significantly more product. Exhibit A-5, ¶¶28-30. Thus, as a natural corollary of Eco Fiber's own claims, bolstered by Yukon's sworn testimony, it is evident that Yukon would handily meet demand for its product.

8

## III.    LEGAL STANDARDS

A motion for a temporary restraining order is analyzed under the same test applied to motions for preliminary injunctions. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411 (4th Cir. 1999); *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This Court is empowered to issue an e*x parte* TRO where immediate and irreparable injury, loss, or damages will result to the movant before the adverse party may be heard in opposition. *See* Fed. R. Civ. P. 65(b).

## IV.    ARGUMENT

A temporary restraining order is necessary because Yukon is likely to succeed on the merits and would suffer irreparable harm in the absence of immediate injunctive relief. *AstraZeneca LP v. Apotex Corp.*, 633 F.3d 1042, 1050 (Fed. Cir. 2010) (citing *Winter*, 555 U.S. at 20).

### A.    Yukon is Likely to Succeed on the Merits

The Patents-in-Suit protect various aspects of Yukon's innovations in cold-chain solutions, which have contributed to the popularity and success of its flagship 3-Piece Design. The proof of Defendant's infringement is straightforward and unassailable, and in most instances is confirmed by Defendant's own documents and its prior arguments in the Related Actions. Defendant is not shy about admitting that the Accused Product was designed by the Patents' inventor (under a previous license), using the Patents-in-Suit as a blueprint.[9] In prosecuting the Related Federal Action, Defendant even argued that the Accused Product is "the same" as Yukon's 3-Piece Design, which practices the Patents-in-Suit. Exhibit A-12, pgs. 2-3. Yukon's claim charts [DE 1-7, DE 1-8, DE 1-9] establish clearly and convincingly that the Accused Product infringes *several* claims of *each* of the Asserted Claims of the Patents-in-Suit—though infringement of only *one* claim of *one* patent is sufficient to support an injunction. For its part, Defendant cannot raise a meritorious question regarding infringement or validity of *all* of the Asserted Claims of *each* Patent-in-Suit.

---

[9] Consider an analogous situation where a restaurant had previously hired an independent chef to teach its kitchen staff how to make a casserole, wherein the chef's guidance was based on his cookbook containing the recipe for that casserole. It would not be surprising that, after the restaurant and chef parted ways, the restaurant continued to make and serve a casserole that followed the recipe in the cookbook.

For purposes of this Motion, Yukon need only show that it is substantially likely to prevail on the merits of at least one of its patent infringement claims. Yukon does far more than that.

### 1. The Accused Product Infringes the '264 Patent

"[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States … infringes the patent." 35 U.S.C. §271(a). As demonstrated in DE 1-7, the Accused Product literally infringes at least claims 1, 4-6 and 13 of the '264 Patent. The Accused Product is an "insulated container" comprising each of the claim elements of Claim 1:

- Claim Element 1[a]: each Accused Product comprises a 6-sided cardboard box, *i.e.*, a "rigid container having a bottom, front, rear, left, and right sides, and a selectively closable top side…" [DE 1-7, pgs. 3-8.]. Documents produced in the Related State Action identify the dimensions of each of the various sizes of the Accused Product, expressed as *length* x *width* x *height*. [*E.g.*, *id.*, pgs. 7-8.] For each size of Accused Product, the three pairs of opposing sides (*i.e.*, top/bottom, left/right, and front/rear) have the "same height/length and width as one another."

- Claim Element 1[b]: each Accused Product comprises a "first insulated pad having a predetermined thickness and density…" The thickness and density of the Accused Product directly affects its ability to insulate, such that, for each insulated pad, both parameters are "predetermined." This too is confirmed by Defendant's own documents, including emails with customers discussing those parameters. [*Id.*, pgs. 9-11.] The diagram on pages 13-14 of the '264 Patent claim chart shows an exemplary Accused Product wherein the insulated pads have a predetermined thickness (red arrows), a predetermined density (blue arrow), and dimensions (length, width, and perimeter) (green arrows).

- Claim Element 1[c]: each Accused Product comprises a "second insulated pad identical to the first insulated pad." This too, is confirmed by the "Item Description" table in the claim chart which describes the "TOP/BOTTOM PAD" with a single set of dimensions and explains that that there are "2 [Such] Pads Per [Accused Product], 1 Top, 1 Bottom." [*Id.*, pgs. 13-14.]

- Claim Element 1[d]: each Accused Product comprises a "third insulated pad having the same thickness and density…" Again using the exemplary image of Defendant's "Item Description," the "WALL THICKNESS" and "DENSITY" are used to describe *all three* insulated pads,

10

including the "TOP/BOTTOM" (first and second insulated pads) and the "SIDE PANEL" (third insulated pad). The table further confirms that the "SIDE PANEL" has a "HEIGHT" (thickness) of 2" (purple arrow). [*Id.*, pgs. 13-14.] The stated dimensions of the "SIDE PANEL" (34.75"x7.75") confirms that its length is longer than the width of the first insulated (34.75" > 9.125") but shorter than the perimeter of first insulated pad (34.75" < (41.25" or 11.5" + 11.5" + 9.125" + 9.125).

- Claim Element 1[e]: Defendant's "Assembly Set Up Sheet" (Exhibit A-26, pg. 4 ("Add Bottom Pad," "Add Side Pad," "Add Top Pad")) as well as Eco Fiber's April 12, 2024 Non-Infringement Opinion (Exhibit A-27, pgs. 14-16 ("Description of the EF Method"))confirm that the Accused Product is assembled and sold only after each of the insulated pads is "positioned" in accordance with this claim step. Exhibit A-27, pg. 16; *see also* DE 1-7, pgs. 19-21; *see also* Exhibit A-29, pg. 2 ("By placing the wrapped lines into boxes…").

- Claim Element 1[f]: the "first insulated pad" of each Accused Product comprises "a quantity of recycled post-industrial, preconsumer natural fiber, and synthetic fiber." [DE 1-7, pgs. 22-23.] This aspect of the Accused Product is one of Defendant's key marketing points. [*Id*. ("Made from recycled cotton, our lines are sourced from discarded jeans and t-shirts and processed with a non-woven binding agent").]

As demonstrated above, and in DE 1-7, the Accused Product squarely meets each of the five elements of independent Claim 1 of the '264 Patent. The Accused Product further infringes several dependent claims, including Claims 4-6 and 13. [DE 1-7, pgs. 24-33.]

## 2. The Accused Product Infringes the '265 Patent

The '265 Patent is a continuation of the '872 Patent, which the Parties are litigating concurrently in the Related Federal and State Actions. The '265 Patent recites a 9-step method for "forming an insulated container." The '872 Patent recites a similar method, except that it recites two additional "loading" steps which **the '265 Patent does not**. Exhibit A-23.

These two missing steps are crucial because Eco Fiber has repeatedly argued that it does not infringe the '872 Patent on account that it does not perform its two "loading" steps.[10] Eco Fiber

---

[10] *E.g.*, Exhibit A-11, pg. 8:7-12 ("[the '872 Patent] actually recites 12 steps that are part of the inventive process. A couple of the steps are loading the box with the thermally sensitive objects

even told Judge Whitney in the Related Federal Action that "the **only issue** would be those downstream steps -- the steps performed by a downstream entity of **loading** the box with the cold pack and the thermally sensitive objects." *Id.*, pg 46:5-12 (emphasis added); *see also* Exhibit A-13, ¶¶148–49, 168–69. Eco Fiber likely did not realize at the time that its attempt to evade exposure to the '872 Patent is tantamount to an admission that Defendant likely infringes the newly issued '265 Patent. The claim chart attached to Yukon's Complaint [DE 1-8] demonstrates that, in forming the Accused Product, Defendant practices each and every step of Claim 12 of the '265 Patent. For example:

o Claim Element 12[a]: Defendant provides "a rigid container having a bottom, front, rear, left, and right sides, and a selectively closable top side…," *i.e.*, a 6-sided cardboard box. [DE 1-8, pgs. 1-7.][11]

o Claim Element 12[b]: Defendant provides "a quantity of post-industrial, pre-consumer cotton or synthetic waste fiber." [*Id.*, pgs. 8-9.] As with Claim Element 1[e] of the '264 Patent, *supra*, pg. 14, infringement is demonstrated by Defendant's own marketing materials.[12] [DE 1-8, pg. 8 ("Made from recycled cotton….").]

o Claim Element 12[c]: Defendant provides a "processing machine, selected from the group consisting of carding, airlay, and needle punch…" [*Id.*, pgs. 10-13.] Defendant admits to using an airlay machine to perform this step. Exhibit A-27, pg. 15 ("airlay machine [used] to produce a continuous sheet of non-woven material of a desired thickness."); Exhibit A-39.

---

and loading the box with the cold pack. That is not performed by Eco Fiber."); *id.*, pg. 10:22-24 ("Because we don't perform the entire method of the patented process, the customer, Customer 1 has to load this box with the cold pack and the thermally sensitive objects."); *id.*, pg. 16:13-18 ("At the end of the day, the ['872] patent simply doesn't cover this product. What I have here is not the result of all 12 steps that's recited in the claim of the patent. The steps are missing. The product hasn't been loaded. The cold pack hasn't been loaded. That's done by customer one downstream to Veritiv."); *id.*, pg. 35:13-16 ("They've acknowledged that the step of loading this with a cold pack and with thermally sensitive objects is done in a downstream entity."); *id.*, pg. 36:4-5 ("The process has not been completed until Customer 1 has loaded this box.").

[11] This claim element is identical to element 1[a] of the '264 Patent. *Supra*, pg. 13.

[12] This element is slightly different than appears in claim element 1[e] of the '264 Patent in that it specifically claims "cotton" (as opposed to more broadly claiming "natural fibers") and is written as a disjunctive ("cotton *or* synthetic waste fibers"), whereas, in the '264 Patent, it is written as conjunctive ("natural fiber, *and* synthetic fiber"). Since Defendant provides, and since the Accused Product comprises both cotton (a natural fiber) and synthetic fiber, both elements are satisfied.

12

o <u>Claim Element 12[d]</u>: Defendant provides a "blade configured to crosscut the continuous sheet…" [DE 1-8, pgs. 14-15.] Eco Fiber's own attorney admits that Defendant uses a 'Die-Cut Machine' comprising "one or more cutters…to cut the continuous sheet". <u>Exhibit A-27</u>, pgs. 15-16 ("the die is pressed into the [continuous] sheet…to produce a matrix of insulated pads of desired dimensions.").

o <u>Claim Element 12[e]</u>: Defendant "feed[s] the … fiber into the processing machine." [DE 1-8, pg. 16.] Again, Defendant's own diagrams and explanation depicted this step. <u>Exhibit A-27</u>, pgs. 14-15.

o <u>Claim Element 12[f]</u>: Defendant "cut[s] the continuous sheet as the continuous sheet exits the processing machine with the blade…." [DE 1-8, pgs. 17-20.] In its diagrams and explanation, Mr. Tillman goes on to explain how the continuous sheet transitions to the "Die-Cut Machine" as it comes out of the "Airlay Machine." The remainder of this claim element—relating to the dimensions of the insulated pads—is demonstrated by simple and incontrovertible measurements. [DE 1-8, pgs. 19-20.]

o <u>Claim Elements 12[g], 12[h] and 12[i]</u>: Defendant places each of the first, second, and third insulated pads into the rigid container in accordance with these three steps such that they collectively "form an insulated enclosure within the rigid container." [DE 1-8, pgs. 21-23.].

o <u>Claim Element 13[j]</u>: all of insulated pads are both biodegradable and recyclable. [*Id*., pg. 24.]

The evidence above validates Mr. Tillman's ***own assessment***—*i.e.*, that Defendant only practices 10 of 12 steps of the '872 Patent[13], or, in this case, all 9 steps of Claim 12 of the '265 Patent. The Accused Product also infringes dependent claims 15 and 17 of the '265 Patent. [DE 1-8, pgs. 25-28.]

### 3. The Accused Product Infringes the '562 Design Patent

As it relates to the '562 Design Patent, it is the patent's figures, rather than words, that demonstrate infringement.[14]

---

[13] The Parties' dispute as to whether Defendant also practices the remaining two "loading" steps of the '872 Patent is not germane to the Patents-in-Suit, which do not claim those steps. And there is no dispute that Defendant practices the "closing" step, which is claimed in the '872 Patent but omitted in the '265 Patent.

[14] "Words cannot easily describe ornamental designs." *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016) (citing *Dobson v. Dornan*, 118 U.S. 10, 14 (1886)) (explaining

13

As shown below, and in the accompanying claim chart [DE 1-9] it is clear that the '562 Design Patent and the Accused Product are substantially similar in appearance:[15]

**B.      Absent an Injunction, Yukon will Suffer Irreparable Harm**

Absent injunctive relief, Defendant's aggressive expansion and continued sale of the Accused Product during the pendency of this case will inflict substantial and irreparable harm on Yukon. The Accused Product incorporates the key patented features of the Patents-in-Suit, and sales of the Accused Product will permanently reduce Yukon's market share. Where, as here, the parties compete in a two-player market, irreparable harm can be inferred. *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011) ("the existence of a two-player market may well serve as a substantial ground for granting an injunction—*e.g.*, because it creates an *inference* that an infringing sale amounts to a lost sale for the patentee") (emphasis added).

The harm to Yukon would extend far beyond the loss of market share, and would radiate out in a myriad of other ways, causing irreversible price erosion, loss of reputation and goodwill, and derail Yukon's own plan to expand to meet the demands of a growing market. Because these harms cannot be measured, Yukon cannot later be fully compensated by monetary damages. Each form of harm that will befall Yukon—loss of market share, irreversible price erosion, loss of business opportunities, and loss of reputation and goodwill—all necessarily flow from Defendant's infringement. *See Apple Inc. v. Samsung Elecs. Co.*, 735 F. 3d 1352, 1361 (Fed. Cir. 2013).

**1.      Loss of Market Share**

It is well-established that loss of market share to a competitor constitutes irreparable harm. *See Robert Bosch*, 659 F .3d at 1151; *see also 02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 2011 WL 5601460, at *8-9 (Fed. Cir. Nov. 18, 2011) (plaintiff "demonstrated an irreparable injury because it directly competes with [defendant], causing a loss in [plaintiff's] market share"). Indeed,

_____

that a claim "is better represented by the photographic illustration than it could be by any description").

[15] "If, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." *Gorham v. White*, 81 U.S. 511, 528 (1871); *Sun Hill Indus., Inc. v. Easter Unlimited, Inc.*, 48 F.3d 1193, 1196 (Fed. Cir. 1995). This is true for all potential purchasers, including both end-users as well as resellers of all sizes and sophistication (*e.g.*, Veritiv).

as the Federal Circuit explained, a court "commit[s] a clear error of judgment" when it fails to find irreparable harm in the face of "evidence of ... the parties' direct competition" and "loss in market share and access to potential customers resulting from [the defendant's] introduction of infringing" products. *Robert Bosch*, 659 F.3d at 1151.

Although "the party seeking an injunction bears the burden of showing lost market share, this showing need not be made with direct evidence." *Robert Bosch*, 659 F.3d at 1154. Rather, Yukon need only make "a prima facie showing of lost market share" and is entitled to relief if Defendant proffers insufficient evidence to rebut that showing. *Id*. As the Federal Circuit remarked in *Douglas Dynamics*, "[w]here two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013). "[S]ome courts have referenced the fact that the patented product is at the core of a party's business when explaining their bases for *granting* an injunction." *Robert Bosch*, 659 F.3d at 1152 (emphasis in original) (citing *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 531 (D. Del. 2008)).

Here, Yukon has made far more than a *prima facia* showing of harm. Yukon has provided a detailed expert analysis of the relevant market, relying on Defendant's own documents as well as declaration testimony, demonstrating conclusively that it will lose market share absent relief.

First, Yukon has proffered a three-legged proof that the Parties compete in a two-player market: (1) Defendant's previous argument in the Related State Action regarding a two-player market, and the court's acknowledgement thereof (Exhibit A-8, pg. 45 (THE COURT: "there is a flavor from all of the filings here that this is a two-business industry, that it's this side and that side and that's it") (citing *id*. at pgs. 14, 26, 60)); (2) Dr. Poindexter's expert analysis—which itself relies on declaration testimony (Poindexter Rep., pg. 5; and (3) the internal emails of the Parties' largest customer. *E.g.*, Exhibit A-41. Thus, at the outset, Yukon's evidence supports an "inference" of irreparable harm. *Robert Bosch*, 659 F.3d at 1151. A corollary of the parties' competing in a two-player market is that Defendant's ambitious plans to expand operations can only come at Yukon's expense. Poindexter Rep., pg. 5 (referring to the "zero sum" dynamic between the parties).

Second, the Parties' largest customer—Veritiv—considers Yukon's 3-Piece Design and the Accused Product as interchangeable (*e.g.*, Exhibit A-41), and Defendant has argued elsewhere that the products are "the same." Exhibit A-12, pg. 6 n.8 ("That the competing products are the same only makes sense. The competing products are specifically designed to be sold to Veritiv for sale by Veritiv to the same customer according to that customer's specifications").[16] In the context of market share loss, this two-way rivalry for Veritiv business is particularly noteworthy since both Yukon and Defendant derive the overwhelming majority of their revenue from Veritiv (~95% and ~85%, respectively). Exhibit A-5, ¶20; Exhibit A-2, DE 26 at¶¶ 23-24; *Int'l Rectifier Corp. v. IXYS Corp.*, 2006 WL 8433999, at *9 (C.D. Cal. Nov. 13, 2006) (defendant considering plaintiff as "'primary' competitor" supported finding of irreparable harm); *3M Unitek Corp. v. Ormco Co.*, 96 F. Supp. 2d 1042, 1051 (C.D. Cal. 2000) ("Where two competing products will be competing in the market for the duration of the litigation," it is almost always the case that "[t]he sale of the defendant's product will, most definitely, hurt plaintiffs' market share and profitability."). There is no dispute that the Accused Product is designed to compete directly with, and take sales (and hence, market share) from its only competitor, Yukon. In an email encouraging Veritiv not to buy from a "single source" (*i.e.*, Yukon), Defendant acknowledged that sales of the Accused Product cut directly into Yukon's market share. Exhibit A-16. There is no clearer proof that "an infringing sale [by Defendant] amounts to a lost sale for [Yukon]." *See Robert Bosch*, 659 F.3d at 1151.

Third, not only will Yukon's market share continue to decrease, but the *rate* at which Yukon loses market share to Defendant will *increase* as Defendant executes its stated plan to expand. *Supra*, Section II.C ("Defendant Recently Entered the Market and is Poised to Expand Rapidly"); Poindexter Rep., pg. 5. Whereas its predecessor (Eco Fiber) was only able to compete with Yukon in the Charlotte area (mostly due to capacity and freight impact of shipping long distance)[17], Defendant has broadcasted its plan to use JFC's size, funding, and distributed network (all of which dwarf Eco Fiber's) to compete with Yukon nationwide. Exhibits A-30, A-31. The U.S. map on page 4, *supra*, proves that Defendant's shipments now travel shorter distances. As

---

[16] *See also supra*, pg. 8 n.6 (string-cite of additional quotes regarding similarly of products).
[17] *See, e.g.*, Exhibit A-3, pgs. 3-4 (citing Exhibit A-10, ¶¶ 33-34); Exhibit A-6 (The Court: "One reasonable inference is that Eco Fiber's excessive freight costs and unfulfilled promises [to expand] are to blame for much of its lost business.").

explained above, by partnering with JFC, Defendant has lowered its cost of raw materials (selling fiber is JFC's core business) and its shipping costs, since it can now ship directly from JFC's distributed infrastructure. *Supra*, Section II.C; Exhibit A-39 (prior to joint venture, Veritiv noting that Eco Fiber was not making their own cotton and so had to buy it and pay a premium as well as have the added freight cost to bring it in).

By virtue of its sheer size and backing, Defendant poses a greater existential threat to Yukon's market share than did Defendant's predecessor, particularly given the legal significance of the fact that the Parties compete in a two-player market, and directly compete for the Veritiv business, wherein Veritiv treats the two products as interchangeable.

### 2. Drastic and Irreversible Price Erosion

The result of Defendant's recent expansion combined with the fact that Veritiv considers Yukon's 3-Piece and the Accused Product as interchangeable (as to their quality) will force Yukon to compete against its own technology *on price*. Poindexter Rep., pg. 6 (citing Exhibit B-5 ("When banks compete, you win")). Below, using documents and expert testimony, Yukon demonstrates two economic certainties: (1) Yukon must lower prices immediately to compete against its own patented technology, and (2) those price reductions will be irreversible.

Absent injunctive relief, Defendant's unlawful competition during the upcoming pricing negotiations between Yukon and Veritiv will force Yukon to permanently lower its prices for 2025 and beyond. Given Defendant's massive and geographically distributed infrastructure, Defendant plans to bid for Veritiv accounts across the country, forcing Yukon into the unnatural posture of trying to under-bid its *own* patented technology. Several compounding market factors dictate that Yukon's across-the-board price reductions would be permanent including: (1) the sophistication of the downstream buyers involved (*e.g.*, Veritiv and Customer 1[18]); (2) the fact that Veritiv only allows price increases once per year; (3) the number of affected downstream customers and end-users; and (4) the fact that, as an infringer, Defendant has no R&D costs to internalize such that it can undercut Yukon's prices. These market factors are addressed below:

*First*, Veritiv is a publicly-traded Fortune 500 company (NYSE:VRTV) and a *very* sophisticated buyer. Vance Decl., ¶¶11-20 (citing Exhibits C-1 and C-2); *see also, e.g.,* Exhibit A-

---

[18] Customer 1 is a customer of Veritiv. A pseudonym is used for reasons of confidentiality.

38 (questioning proposed price increase while raw materials and labor are "down"). Yukon's current pricing to Veritiv was set by agreement in April 2024. Come January 31, 2025, as per Veritiv's protocol, Yukon must submit its proposed pricing for the following year. Vance Decl., ¶¶36-37. Between February and April 2025, Yukon will bid on pricing terms for the sale of its 3-Piece Design to Veritiv, with separate bids for delivery to each of Veritiv's facilities across the country, calculated to account for freight impact. Vance Decl., ¶¶37-41.

*Second*, Yukon's ability to increase its annual pricing to Veritiv is circumscribed pursuant to a master "Vendor Pricing Commitment Agreement." Exhibit A-7 ("such pricing may only be subject to increase by no more than eight percent (8%) in the aggregate over the then existing pricing in any subsequent calendar year during the Term"). Notably, in recent years, Yukon has been forced to raise its prices merely to offset the increased costs of raw materials, labor, shipping, etc. *E.g.*, Vance Decl., ¶¶20-22 (citing Exhibits C-1, C-2) ("Price increases are never easy. However, we must increase pricing to offset the rising costs of raw materials, labor…."; Exhibit A-4, ¶¶ 27-28, 32-34 (discussing Eco Fiber price increase to Veritiv). In other words, Yukon depends on Veritiv's regulated annual price increase to *sustain* its margins.

*Third*, Veritiv is not the end-user, and it is not even the end-customer. Rather, Veritiv is an intermediary in a very long and sophisticated supply chain, and it must naturally pass on any price increases to its end-customer (*e.g.*, Customer 1), to be passed on further to the end-user. Poindexter Rep., pg. 2; Exhibit A-39 ("We cannot pass [price increase] to [Customer 1] without appropriate documentation"). For this (or any) supply-chain to function, where margins are already thin, some downstream entity must eventually be willing to absorb price increases. Poindexter Rep., pg. 2. If Yukon's prices were forced lower during this lawsuit as a result of Defendant's unlawful and unrestrained competition, it would be highly uncharacteristic for this particular supply chain to allow Yukon to later correct (*i.e.*, re-raise) prices following a permanent injunction, particularly given both the length of the supply chain at issue and the length of time during which Yukon's prices would be artificially deflated, i.e., until a permanent injunction would issue. Poindexter Rep., pgs. 2, 5-7.[19]

---

[19] https://brochure.docketnavigator.com/how-top-us-patent-courts-compare-on-median-time-to-trial-statistics/

18

*Fourth*, Yukon's pricing must also account for a key cost that Defendant, because of its infringing conduct, never incurred—R&D relating to the patented technology. Yukon has invested heavily in research and development, testing, and in protecting its intellectual property related to its 3-Piece Design, including by seeking patent protection. Exhibit A-10, ¶¶10-15. Naturally, Yukon's 3-Piece Design is priced to reflect these on-going costs, and to recoup investment.[20] To date, Veritiv has been willing to pay Yukon's prices in part because its 3-Piece Design represents a quantifiable improvement over Legacy Products, wherein the Patents-in-Suit provide Yukon with exclusive rights to monetize that improvement. Poindexter Rep., pgs. 2, 6-7. Defendant has managed to avoid R&D costs by ripping off Yukon's patented technology and launching a copycat product.

As a consequence of these four market factors, Yukon will very soon be forced to drastically reduce margins on its 3-Piece pricing, including to Veritiv, which currently accounts for approximately 95% of Yukon's revenues and profits. Vance Decl., ¶30. Faced with this existential threat, Yukon has already developed such a contingency plan. *Id.*, ¶¶35-43. Mr. Vance, who was personally involved in all of Yukon's previous negotiations with Veritiv, estimates that Yukon will be forced to absorb a *negative* profit margin on several Veritiv accounts to remain as a preferred vendor. *Id.*, ¶¶43. Yukon's profit margins on some accounts would plummet between 30% and 40% overnight. *Id.* Dr. Poindexter confirms the inevitability of Yukon's bleak prediction. Poindexter Rep., pgs. 2, 5-6; s*ee, e.g., Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc.*, 821 F. Supp. 2d 681, 694 (D.N.J. 2011), *aff'd and remanded sub nom.*, 748 F.3d 1354 (Fed. Cir. 2014) ("Plaintiffs have been forced to reduce its prices in order to compete with Defendants' generic product").

This drastic price erosion would almost certainly be irreversible. Poindexter Rep., pg. 2; Vance Decl., ¶¶21, 44-45. For the reasons explained above, the market would likely reject any

---

[20] In the long term, since Yukon must believe that it can recoup any future investment in research and development before it deploys further capital, such future investment is largely hold. Vance Decl., ¶56; Poindexter Rep., pg. 6; *Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (absent a preliminary injunction, plaintiff "would be required to reduce its research and development activities"). Though Yukon does not devote an entire section to making this point, its inability to justify further innovation at this time is a separate cognizable irreparable injury that supports injunctive relief.

19

future attempt by Yukon to recapture the price erosion. *See AstraZeneca LP v. Apotex, Inc.*, 623 F. Supp. 2d 579, 613 (D.N.J.), *aff'd*, 633 F.3d 1042 (Fed. Cir. 2010) ("price changes would likely impact [plaintiff's] reputation" where a "sudden decrease" in the price of [plaintiff's product] to compete with [defendant's product] may cause customers to believe that the original price [ ] had been set at an unfairly high level."); *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1382-83 (Fed. Cir. 2006) (affirming reliance on expert and fact evidence to determine that irreversible price erosion supports a finding of irreparable harm). Simply put, if Yukon's prices fall behind where they should be, on account of Defendant's unlawful competition, they will likely never recover.

### 3. Yukon Will Lose Business Opportunities, Goodwill, and its Reputation as Innovator and Market Leader Will Be Permanently Harmed

Yukon continues to divert significant resources in order to compete with Defendant's unlawful entrance into the market. For example, Yukon's leadership has put nearly all of its growth and expansion plans, including new partnerships and an expanded geographic footprint, on hold, while the company deals with the existential threat posed by Defendant. Vance Decl., ¶56. Though Yukon's on-going loss of business opportunities is tangible, it cannot be quantified.

For example, prior to Defendant's entrance, Yukon was planning to up-size its airlay machine at its Trenton, Tennessee location, which would increase capacity in that facility by 200%. *Id.*, ¶¶53. However, Yukon cannot justify the expenditure at present, since it is unclear how much market share it will continue to lose to Defendant. *Id.*, ¶¶46-58. Yukon has also identified advantageous freight lines in three additional markets and has been in advanced discussions to expand its footprint into each of those markets, including via acquisition of existing operations. *Id.*, ¶¶47-52 (citing Exhibits C-4, C-5). Those plans too, are currently on hold. *Id.*

Yukon's reputation as innovator and market leader is also in jeopardy. Other than Defendant (previously Eco Fiber), Yukon has the only 3-piece insulated container made from natural and synthetic fibers in accordance with the Patents-in-Suit. *E.g.*, Exhibit A-8, pgs. 14, 26, 45, 60; Poindexter Rep., pg. 6. Yukon has staked its reputation on its flagship 3-Piece Design. Vance Decl., ¶¶5-8. Today, Yukon is in danger of losing its "brand distinction and reputation as a leader." *PCT Int'l Inc. v. Holland Elecs. LLC*, No. 12-cv-01797, 2015 WL 5210628, at *23 (D. Ariz. Sept. 8, 2015), *aff'd*, 668 F. App'x 367 (Fed. Cir. 2016) (defendant relied on the infringing

feature in marketing its product, thus "undermining [plaintiff's] market-leading position"). Here too, Defendant advertises two key features of the Patents-in-Suit. [*Compare* DE 1-1, Cls. 1 and 5 ("first insulated pad comprises…natural fiber, and synthetic fiber" and "insulated pads will biodegrade completely within one year or less"), *with* Exhibit A-28, pg. 1 ("Made from recycled cotton…and processed with a non-woven binding agent." and "the liners biodegrade completely within 12 months"); *also compare* DE 1-1 at 1:41-50 ("There is a long felt need in the art for packaging material which affords safe transportation of temperature sensitive materials…"), with Exhibit A-28, pg. 2 ("Compared to traditional packaging materials like styrofoam, we offer exceptional insulation…").

Harm to reputation and goodwill are routinely recognized as irreparable. *E.g., Douglas Dynamics*, 717 F.3d at 1344-45 (patentee will suffer irreparable damage to its "reputation as an innovator" by being forced to compete with an infringing product); *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1207-08 (Fed. Cir. 2017) (patentee forced to compete with infringing products supported irreparable harm); *3M Unitek Corp.*, 96 F. Supp. 2d at 1051 ("[i]f defendant is allowed to free ride on plaintiffs' innovation and technological achievements it will permanently injure plaintiffs' reputation and goodwill"). Although it is impossible to quantify the harm to Yukon's reputation and goodwill that lies just over the horizon, it is certain to follow absent injunctive relief. Poindexter Rep., pgs. 5-7.

### C. The Balance of Hardships Strongly Favors Yukon

The harm to Yukon will be much greater absent an injunction than any harm to Defendant if an injunction is granted. The balance of hardships factor "assesses the relative effect of granting or denying an injunction on the parties." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010). Factors that can be considered include "the parties' sizes, products, and revenue sources." *Id.*. The balance of hardships more strongly favors an injunction where it is "undisputed that it is essentially a two-horse race." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633, 646 (Fed. Cir. 2015) (quoting *Robert Bosch*, 659 F.3d at 1156).

The 3-Piece Design unequivocally is Yukon's flagship product and accounts for 95% of its revenue. Vance Decl., ¶¶30. The 3-Piece Design also drives sales for Yukon's other products (*e.g.*, insulated mailers)—*i.e.*, the innovation embodied in the 3-Piece is the reason for Veritiv's interest

21

in Yukon, and the reason it was willing to on-board Yukon as a vendor, allowing Yukon to also sell its ancillary products. *Id*., ¶¶31; Exhibit A-10, ¶ 65 (rebate program). Yukon has earned its reputation as market leader in this category, including through research and development costs directed to its patented technology. The acquisition of the Patents-in-Suit is only the latest example of such costs incurred over the years. *E.g.*, Exhibit A-10, ¶¶ 10-15, 59-63. At least one million dollars have been spent designing, testing, patenting, improving and protecting Yukon's 3-Piece Design, a cost Yukon is still recouping through sales. Vance Decl., ¶¶10. No other Yukon product line has been through as much testing and as many iterations as the 3-Piece—further evidencing Yukon's commitment to innovation and to persisting as market leader. Exhibit A-10, ¶¶ 59-63. Forcing Yukon to fight for its reputation while also slashing its prices, as described above, would cause immense hardship. Poindexter Rep., pgs. 2-4, 6; *see also*, *e.g., Aevoe Corp. v. Shenzhen Membrane Precise Electron Ltd.*, No. 2:12-cv-00054-GMN, 2012 WL 1532308, at *6 (D. Nev. May 1, 2012).

Conversely, Defendant only recently entered the market on November 22, 2024, less than two months ago, as a joint venture between JFC and Eco Fiber. Exhibit A-21; Exhibit A-30; s*ee PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566 (Fed. Cir. 1996) (minimal hardship to alleged infringer who was in the early stages of marketing its product); *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1171 (Fed. Cir. 2014) (noting as relevant to the equities inquiry that "[plaintiff] is losing business to a new entrant selling a likely-infringing product"). The Accused Product is Defendant's first iteration—there is no product lineage or longstanding reputation to speak of. Defendant is merely the latest venture JFC's extra-large portfolio which spans at least other industries, none of which are accused of infringement. Exhibit A-35; *Aevoe*, No. 2:12-cv-00054-GMN, 2012 WL 1532308, at *6; *PCT Int'l*, 2015 WL 5210628, at *26 (balance of hardships favored injunction where product was top seller for plaintiff but accounted for only 2% of defendant's sales).

Given JFC's mammoth size, the number of industries it serves, its vast portfolio of products and services, and the fact that it was not selling *any* Accused Product prior to November 2024, any interruption in sales of the Accused Product caused by an injunction will surely be written off as a rounding error. As to Defendant's other backer, Eco Fiber, pursuant to the confidential terms of

the Joint Venture Agreement, Eco Fiber has already received a substantial **_guaranteed_** promissory note from JFC and will continue to receive a large monthly payment, **_injunction or not_**. Exhibit A-20; Exhibit A-21, pg. 1.

Additionally, in balancing hardship, courts are less sympathetic to accused infringers who knowingly walk an infringing path—"[i]t is axiomatic that an infringer ... cannot complain about the loss of ability to offer its infringing product." *LEGO A/S v. ZURU Inc.*, 799 F. App'x 823, 832 (Fed. Cir. 2020); *Port-a-Pour, Inc. v. Peak Innovations, Inc.*, 49 F. Supp. 3d 841, 873 (D. Colo. 2014) ("Moreover, I can give no weight to harm [defendant] might sustain by an injunction against selling infringing products."); *TM Comput. Consulting, Inc. v. Apothacare, LLC*, 2008 WL 4238913, at *9–10 (D. Or. 2008) (balance of harms favored licensor because licensee misused licensor's rights even after termination of license and "grant of a preliminary injunction only will prevent defendants from doing what they are not authorized to do").

Defendant cannot now act surprised that it faces an injunction, having previously argued that it was anticipating the Patents-in-Suit, recognizing that they would be similar to the '872 Patent (at issue in the Related Federal Action) but that the Patents-in-Suit would omit the two "loading steps"—the very claim elements on which Defendant relied to argue non-infringement of the '872 Patent. Exhibit A-13, ¶ 49 ("Vance will seek issuance of a patent from the '672 Application that contains a claim that recites the same claim language as claim 1 of the '872 Patent but that omits either the Object Loading Step or Cold Pack Loading Step, or that omits both the Object Loading Step and Cold Pack Loading Step, **_and Vance will then assert infringement of such claim against EFI_**") (emphasis added); *see also* Exhibit A-14, pg. 7 ("Vance is seeking additional patent protection through pending applications related to the '872 Patent which omit these loading steps"). There is no evidence that Defendant took any steps to avoid infringement. To the contrary, with full knowledge of the patented subject matter, and having previously acknowledged its exposure thereto, Defendant chose to enter the market and expand on its predecessor's operations.

Lastly, Defendant is responsible for several instances of bad faith conduct towards Yukon which undercut its right to claim any hardship. For example, Defendant's leadership has taken steps to poison Yukon's largest customer (Veritiv) against it. *E.g.*, Exhibit A-16 (accusing Yukon

23

of "trying to corner[] you guys and trying to force you and your team to buy from one single source."); Exhibit A-17 (accusing Yukon of "threatening their customers"); Exhibit A-37 (accusing Yukon of a "MASSIVE plot of Conspiracy").

In sum, the Accused Product has simply not been around long enough to be as important to Defendant's sales, nor as central to Defendant's identity and reputation, as the 3-Piece Design is to Yukon. Returning to the *status quo ante* November 22, 2024 will not prejudice Defendant or its beneficial owners. Defendant's decision to walk an infringing path and its demonstrated bad faith conduct in the Related Actions further tip the scales in favor of an injunction.

Conversely, permitting Defendant to erode Yukon's exclusivity and reputation would be devastating. Yukon's enduring commitment to its 3-Piece Design is undeniable—its very identity tied to its flagship product. Having been "deprived of its exclusivity and forced to compete against its own innovation usurped by its largest and fiercest competitor," the balance of hardships thus overwhelmingly favors Yukon and injunctive relief. *See Apple Inc.*, 809 F.3d at 646.

### D. The Public Interest Weighs in Favor of a Preliminary Injunction

The public has a significant interest in protecting patents from infringement. In evaluating the public interest factor, courts must consider the right to exclude as "[t]he heart of the patent grant," without which incentives for research and development are lost. *ActiveVideo Networks, Inc. v. Verizon Commc'n, Inc.*, 694 F.3d 1312, 1341 (Fed. Cir. 2012); *Apple Inc.*, 809 F.3d at 647 ("the encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude.") (quoting *Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed.Cir.2006)). Here, the benefits of the patent system encouraged Yukon to invest the significant resources necessary to innovate in the field and develop and test a safe, reliable, and environmentally friendly improvement over Legacy Products. *E.g.*, Exhibit A-10, ¶¶ 10-15, 59-63. The public (especially customers, end-users, and the environment) have benefited from the Patents-in-Suits' innovative features—a benefit realized in large part because of patent protection. Poindexter Rep., pgs. 6-7. No public interest outweighs encouraging this type of investment in sustainable cold-chain technology. Where, as here, Yukon practices its own inventions and has the capacity to fully and reliably meet demand, as it has always done in the past (Vance Decl., ¶¶59-

61),[21] "the public interest nearly always weighs in favor of protecting property rights." *Apple Inc.*, 809 F.3d at 647.

## V. CONCLUSION

For the foregoing reasons, Plaintiff Yukon Packaging, LLC respectfully submits that the Court should grant its motion and enter a temporary restraining order.

DATED this 14th day of January, 2025.

Respectfully submitted,

*/s/ Tom BenGera.*
Samuel Alexander Long, Jr. (N.C. Bar No. 46588)
Lucas D. Garber (N.C. Bar No. 47756)
Tom BenGera (N.C. Bar No. 57019)
SHUMAKER, LOOP, & KENDRICK, LLP
101 S Tryon Street, Suite 2200
Charlotte, NC 28280
Tel: 704-375-0057
Fax: 704-332-1197
Email: along@shumaker.com
         lgarber@shumaker.com
         tbengera@shumaker.com

*Attorneys for Plaintiff*

---

[21] In fact, Defendant's largest customer (Veritiv) has already made the switch to using Yukon exclusively once before. Exhibit A-41("The attached are to be converted from EcoFiber to Yukon Packaging"); *id* ("Please take this email as official confirmation of ***approval to convert to Yukon***") (emphasis in original email); ExhibitA-40 (Question: "Can we make the move to all Yukon?; Answer: Yes – we can move the [Customer 1] business to Yukon"). And, though Eco Fiber was a smaller operation than Yukon, it previously claimed to be able to meet 100% of Veritiv's demand. Exhibit A-2, pg. 10 ("EFI is ready and able to promptly provide Veritiv with all cold chain packaging needed upon the Defendants being enjoined from providing such products.").

25

## ARTIFICIAL INTELLIGENCE (AI) CERTIFICATION

I hereby certify the following:

1.      No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2.      Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 14th day of January, 2025.

*/s/ Tom BenGera*

26